UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| TCI PACKAGING, LLC | CIVIL ACTION |
|---|---|
| VERSUS | No. 19-10861 |
| HUB INTERNATIONAL MIDWEST LIMITED | SECTION I |

## ORDER & REASONS

Before the Court is defendant HUB International Midwest Limited's ("HUB") motion[1] for summary judgment against plaintiff TCI Packaging, LLC ("TCIP"). For the following reasons, the motion is granted in part and denied in part.

### I.

#### *i. Background of the Parties*

TCIP provides packaging services for manufacturers and traders of certain petrochemicals, including polyvinyl chloride ("PVC").[2] TCIP is a part of Jensen Companies, a portfolio of entities owned and operated by the Jensen family and overseen by company president Christian Jensen ("Jensen").[3]

HUB is an insurance brokerage company that procured insurance coverage for TCIP and other companies within the Jensen portfolio.[4] HUB's principal point of contact for companies in the Jensen portfolio was Jeffrey Louis ("Louis"), president of

---

[1] R. Doc. No. 47.
[2] R. Doc. No. 47-3, at 1; R. Doc. No. 61, at 1.
[3] R. Doc. No. 61-4, at 1.
[4] R. Doc. No. 80-1, at 1.

1

TCI Trucking, Inc.[5] Louis regularly communicated with HUB regarding insurance issues for all of the Jensen companies, including TCIP.[6] Rowland Stalter ("Stalter") served as the HUB insurance broker of record for TCIP from approximately 2004 or 2005 to 2019; his role was to procure insurance policies for TCIP's business operations.[7]

Over the course of their commercial practice and "good working relationship," Stalter and Jensen had regular consultations every two to three months to discuss TCIP's operations, business strategies, and insurance coverage.[8] During these meetings, Jensen would communicate to Stalter the risks associated with TCIP's business against which Jensen wanted to insure.[9] Jensen also conducted site visits and facility walk-throughs with Stalter to apprise Stalter of TCIP's operations and ensure that TCIP had risk coverage for every segment of its supply chain.[10] On a yearly basis, Jensen met with Stalter to review insurance policies for every company in the Jensen family portfolio and discuss policy additions or amendments that needed to be made.[11] According to Jensen, Stalter continuously advised him that his insurance policies provided coverage for cargo that was in the company's "care, custody, and control."[12]

---

[5] R. Doc. No. 80-1, at 1–2; R. Doc. No. 61-4, at 3; R. Doc. No. 61-1, at 36.
[6] *Id.*
[7] R. Doc. No. 47-4, at 1; R. Doc. No. 47-25, at 1; R. Doc. No. 61-24, at 1 R. Doc. No. 61-25, at 1–2.
[8] R. Doc. No. 61-1, at 9; R. Doc. No. 61-4, at 1.
[9] R. Doc. No. 61-1, at 10.
[10] *Id.* at 11.
[11] *Id.* at 15.
[12] *Id.* at 12–13.

In 2016, Jensen embarked on a multimillion-dollar capital investment for TCIP to build an outdoor facility on 3900 France Road in New Orleans, which would process and package raw PVC resin for export overseas.[13] Operations began in October 2016.[14] At the 3900 France Road facility, TCIP receives raw PVC resin from its customers and packages the raw material into "super sack" bags and onto pallets.[15] After they are palletized, the bags containing the PVC resin are then stored outside until the customer requests that they be shipped overseas.[16]

Before committing to the project, Jensen had sought Stalter's advice as to whether HUB could procure adequate insurance coverage for TCIP's packaging processes and outdoor storage of product.[17] According to Jensen, Stalter affirmed to Jensen that such insurance could be obtained, which would include coverage for packaged bags and cargo stored outside and/or damaged by water.[18]

> ii. *Insurance Policy Coverage Exclusions*

On TCIP's behalf, HUB procured several insurance policies—including, among others, a Warehouse Legal Liability ("WLL") policy—in accordance with the requirements of TCIP's customer contracts.[19] As Stalter explained, TCIP had been

---

[13] R. Doc. No. 47-3, at 1; R. Doc. No. 61-4, at 2.
[14] R. Doc. No. 47-3, at 2.
[15] *Id.* at 1. "Super sack" bags are bags that normally contain one or more metric tons of raw product. *Id.*
[16] *Id.*
[17] R. Doc. No. 61-4, at 2.
[18] *Id.*
[19] R. Doc. No. 47-25, at 2; R. Doc. No. 61-24, at 2. TCIP entered into commercial contracts with customers for its outdoor packaging operations; these contracts required TCIP to have insurance to cover specific risks. *See* R. Doc. No. 47-1, at 14–18; R. Doc. No. 61-1, at 3–4.

3

insured by the WLL policy since at least 2013, and the policy has included a processing and packaging exclusion and coverage limitation on outdoor storage since it was first procured on TCIP's behalf.[20]

Specifically, the WLL policy states, in pertinent part:

PROPERTY NOT COVERED

. . .

>  11. Property in Storage Space – "We" do not cover property for which "you" are acting as a lessor of storage space.[21]

. . .

PERILS EXCLUDED

. . .

>  h. Processing, Work, And Packaging – "We" do not pay for loss caused by processing of or work upon the covered property including packaging or repackaging.[22]

According to Stalter, he specifically advised TCIP as to "what insurance would and would not cover" with respect to TCIP's customer contracts.[23] Stalter also contends that before the wet product complaints arose, as discussed herein, TCIP never inquired about these provisions in the policy or asked that they be removed or modified.[24]

---

[20] R. Doc. No. 47-4, at 2.
[21] R. Doc. No. 47-20, at 46. TCIP has not argued that it does not serve as a "lessor" of storage space.
[22] R. Doc. No. 47-20, at 51.
[23] R. Doc. No. 47-10, at 4.
[24] R. Doc. No. 47-4, at 2.

4

On June 23, 2017, HUB emailed Jensen and Louis to inform them of a pertinent exclusion in the WLL policy.[25] Specifically, Stalter highlighted a "Fungus, Spoilage, Infestation exclusion as regards to fruit & vegetables" in order to "make sure this exclusion will not cause a problem" at the facility on 3900 France Road.[26] The email concluded with a request to Jensen and Louis to "[p]lease let us know your thoughts."[27] Jensen acknowledged that he read and received this email.[28]

On August 3, 2017, HUB emailed Louis a set of insurance policies, including the WLL policy, "issued in accordance with [Louis's] binding instructions" and asked that Louis review the policies and notify HUB of any concerns or desired changes.[29] Based on the evidence presented, it appears that no concerns or suggested modifications were raised by TCIP at that time, and the policies became effective for the 2017-2018 coverage period.[30]

### iii. *The Wet Product Complaints*

Unfortunately for TCIP, it faced customer complaints of damaged shipments within the first several months of its operations at the 3900 France Road facility.[31] Between March 2017, when the first overseas shipments of products packaged in 2017 arrived at customers' designated destinations, and March 2018, TCIP received

---

[25] *See* R. Doc. No. 61-12.
[26] R. Doc. No. 61-12, at 1.
[27] *Id.*
[28] R. Doc. No. 80-3, at 8.
[29] R. Doc. No. 47-4, at 2–3.
[30] *See* R. Doc. No. 47-18, at 6.
[31] R. Doc. No. 47, at 4.

5

complaints of molded or mildewed pallets, muddy pallets, and wet product.[32] TCIP settled these complaints internally by issuing customer credit, and it did not experience significant monetary losses.[33]

To minimize future complaints, around December 2017, TCIP decided to modify its bagging process and use new packaging to better protect PVC from water damage.[34] However, the change did not stem the tide of customer complaints, which "continued streaming in relatively consistently" between March and August 2018.[35] Whereas the earlier complaints centered primarily on the condition of the bags and the presence of mold and mildew, the complaints filed in this latter period were concentrated on actual wet product that customers received in their shipments from TCIP.[36] These "wet product" claims complained of moisture intrusion into TCIP's packaging, which significantly damaged the quality of PVC that customers received.[37]

An internal investigation by TCIP later determined that the cause of the damage was a failure by TCIP employees to properly package the product during the bagging process, which caused the product to become wet during onsite storage before being shipped overseas.[38] When TCIP discovered the root source of its wet product

---

[32] R. Doc. No. 47-3, at 3.
[33] *Id.*
[34] *Id.* at 4.; R. Doc. No. 47, at 3.
[35] R. Doc. No. 47-3, at 5.
[36] *Id.*
[37] *Id.* at 4–5.
[38] *Id.* at 6–7.

6

problems in June 2018, it changed its packaging process once again—this time, to apparent success, as wet product complaints have ceased.[39]

### iv. The Instant Dispute

TCIP first notified HUB of the wet product complaints around March 2018,[40] and it first sought coverage from its insurers for these claims in June 2018.[41] According to TCIP, HUB initially informed TCIP that the insurance policies that HUB had procured on TCIP's behalf would provide the requisite coverage for the wet product complaints.[42] Jensen acknowledged, though, that HUB did not guarantee that TCIP would have such coverage.[43]

HUB worked with TCIP for several months to secure coverage under TCIP's insurance policies.[44] However, the claims were systematically denied because TCIP's policies did not apply to product stored outside or provide coverage for damages to customers' product caused by processing or packaging.[45] Around this same time, TCIP placed a new policy with HUB, the "Stock Throughput" policy,[46] but this policy also failed to cover the claims from the wet product complaints.[47]

Based on the realization that the HUB-procured insurance policies would not provide the necessary coverage, TCIP consulted a new insurance broker, Alliant

---

[39] *Id.* at 9.
[40] R. Doc. No. 61-1, at 23.
[41] R. Doc. No. 47, at 22; R. Doc. No. 47-6.
[42] R. Doc. No. 61-1, at 17–20; R. Doc. No. 61-4, at 3.
[43] R. Doc. No. 61-1, at 28; R. Doc. No. 80, at 9.
[44] R. Doc. No. 47-25, at 7; R. Doc. No. 61-24, at 2.
[45] R. Doc. No. 47-7; R. Doc. No. 61-16, at 1; *see* R. Doc. No. 61-1, at 18–19.
[46] R. Doc. No. 61-1, at 18–20; R. Doc. No. 80, at 10.
[47] R. Doc. No. 47-7; R. Doc. No. 61-16, at 1.

7

Insurance Services, Inc. ("Alliant"), to determine whether the insurance coverage that TCIP needed was available.[48] In January 2019, Alliant procured for TCIP a "Logistics and Transportation Insurance Policy" that, according to TCIP, provided the coverage previously excluded from TCIP's HUB-procured policies.[49]

On January 7, 2019, TCIP filed an action against HUB in Louisiana state court, and the action was removed to the United States District Court for the Eastern District of Louisiana on June 3, 2019.[50]

TCIP subsequently filed an amended complaint on July 9, 2019.[51] TCIP claims that HUB breached its fiduciary duty to TCIP by "failing to procure insurance coverage to cover alleged damage to the property of TCIP's customers caused by TCIP's packaging and storage operations"; that HUB breached its fiduciary duty to TCIP by "negligently mispresenting to TCIP that the insurance HUB procured for TCIP included coverage for damage to the property of TCIP's customers caused by TCIP's packaging and storage operations"; and that HUB breached its duty to "supply correct information to TCIP."[52]

HUB now moves for summary judgment, arguing that TCIP's claims are perempted because TCIP failed to timely file its claims pursuant to La. Rev. Stat. Ann. § 9:5606(A), and that TCIP's claims fail as a matter of law.

---

[48] *See* R. Doc. No. 61-1, at 21–22.
[49] R. Doc. No. 61-1, at 32–33.
[50] R. Doc. No. 1.
[51] R. Doc. No. 12.
[52] *Id.* at 5–6.

8

## II.

### *i.  Summary Judgment Standard*

Summary judgment is proper when, after reviewing the pleadings, the discovery and disclosure materials on file, and any affidavits, the Court determines that there is no genuine dispute of material fact. *See* Fed. R. Civ. P. 56. "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The party seeking summary judgment need not produce evidence negating the existence of a material fact; it need only point out the absence of evidence supporting the other party's case. *Id.*; *see also Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195 (5th Cir. 1986).

Once the party seeking summary judgment satisfies its burden, the nonmoving party must come forward with specific facts showing that there is a genuine dispute of material fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The showing of a genuine issue is not satisfied by creating "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted).

Instead, a genuine issue of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Although the substance or content of the

evidence submitted to support or dispute a fact on summary judgment must be admissible . . . , the material may be presented in a form that would not, in itself, be admissible at trial." *Lee v. Offshore Logistical & Transp., LLC*, 859 F.3d 353, 355 (5th Cir. 2017) (citations omitted). The party responding to the motion for summary judgment may not rest upon the pleadings but must identify specific facts that establish a genuine issue. *Anderson*, 477 U.S. at 248. The nonmoving party's evidence, however, "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor." *Id.* at 255; *see also Hunt v. Cromartie*, 526 U.S. 541, 552 (1999).

## ii. Peremption

Under Louisiana law, an action for damages against an insurance agent or broker is limited by a peremptive period that is not subject to *contra non valentem*—i.e., it may not be renounced, interrupted or suspended. *Huffman v. Goodman*, 34,361, p.7 (La. App. 2 Cir. 4/4/01), 784 So. 2d 718, 725, *writ denied*, 2001-1331 (La. 6/22/01), 794 So. 2d 791; La. Rev. Stat. Ann. § 9:5606(D). Pursuant to La. Rev. Stat. Ann. § 9:5606(A):

> No action for damages against any insurance agent, broker, solicitor, or other similar licensee under this state, whether based upon tort, or breach of contract, or otherwise, arising out of an engagement to provide insurance services shall be brought unless filed in a court of competent jurisdiction and proper venue within one year from the date of the alleged act, omission, or neglect, or within one year from the date that the alleged act, omission, or neglect is discovered or should have been discovered. However, even as to actions filed within one year from the date of such discovery, in all events such actions shall be filed at the

10

latest within three years from the date of the alleged act, omission, or neglect.[53]

"[T]he statute requires a plaintiff to file suit against an insurer within one year of the plaintiff's knowledge or constructive knowledge of the act, omission, or neglect that led to the cause of action, and no later than three years after the act, omission, or neglect actually occurred." *Campbell v. Stone Ins., Inc.*, 509 F.3d 665, 670 (5th Cir. 2007). The peremptive period will begin to run "even if the injured party does not have actual knowledge of facts that would entitle him to bring a suit as long as there is constructive knowledge of the same." *Id.* (quoting *Campo v. Correa*, 2001-2707, p. 11–12 (La. 6/21/02), 828 So. 2d 502, 510)); *Green Trails, LLC v. Stewart Title of Louisiana, Inc.*, 2012-0133, p. 17–18 (La. App. 1 Cir. 9/21/12), 111 So. 3d 14, 17, *writ denied*, 2012-2295 (La. 12/14/12), 104 So. 3d 443. Constructive knowledge is "whatever notice is enough to excite attention and put the injured party on guard and call for inquiry." *Campo*, 898 So. 2d at 511. Such notice is "tantamount to knowledge or notice of everything to which a reasonable inquiry might lead"; peremption starts running when the alleged victim has "[s]uch information or knowledge as ought to reasonably put [him] on inquiry." *Id.*

Under Louisiana law, an insured is deemed to have knowledge of the contents of its insurance policy and any exclusions limiting potential coverage. *Isidore Newman Sch. v. J. Everett Eaves, Inc.*, 2009-2161, p. 11 (La. 7/6/10), 42 So. 3d 352,

---

[53] The peremptive period for such actions does not apply in cases of fraud. La. Stat. Ann. § 9:5606(C). However, no allegation of fraud has been made in this case. *See* R. Doc. No. 47-1, at 7 n.25.

11

359; *Crowley v. GoAuto Ins. Co.*, 2019-0643, p. 3 (La. App. 4 Cir. 11/27/19). Upon receiving a policy of insurance, it is the insured's obligation to read and review the policy "to make certain [its] needs are met." *Newman*, 42 So. 3d at 1182; *see Campbell*, 509 F.3d at 671 ("Louisiana law imposes a duty on the insured to read and know his or her insurance policy provisions.") (collecting cases). Based on this obligation, the one-year peremptive period begins to run when the insured receives a copy of the policy. *Chapital v. Harry Kelleher & Co.*, 2013-1606, p. 8 (La. App. 4 Cir. 6/4/14), 144 So. 3d 75, 83 (citing *Seruntine v. State Farm Fire & Cas. Co.*, 2010-1108 (La. 9/3/10), 42 So. 3d 968).

## III.

The record shows that TCIP had actual or constructive knowledge of HUB's alleged act, omission, or neglect leading to TCIP's cause of action on August 3, 2017— the date that TCIP received the WLL and certain other policies in place at the time of the wet product complaints. *See Chapital*, 144 So. 3d at 83. Evidence shows that Louis, who was the designated contact to receive TCIP's insurance policies from HUB, was emailed a copy of the policy on August 3, 2017.[54] TCIP has not made any assertion that Louis did not receive the policy on that date.

TCIP argues instead that Louis was not responsible for TCIP's risks and insurance matters, but this assertion is belied by the record. According to the affidavit of Andrea Crowe ("Crowe"), an account executive at HUB, Jensen "affirmatively instructed" her to communicate with Louis regarding insurance policies for all

---

[54] R. Doc. No. 47-4, at 3.

12

companies in the Jensen portfolio, including TCIP.[55] Crowe also stated that Jensen instructed Crowe to write down Louis's email address as the "proper recipient" on HUB's "Consent to Receive Electronic Documents" form, which pertained to the electronic transmittal of insurance policies and other related documents from HUB.[56] Jensen signed this consent form with Louis's email address designated as the proper recipient.[57] In addition, an insurance application for certain policies that HUB procured on TCIP's behalf, which included the WLL policy, lists Louis as both the inspection contact and the accounting contact, and it was signed by Louis on June 15, 2017.[58] This application lists TCIP as a "named insured,"[59] and specifies the 3900 France Road facility as a covered location under the WLL policy.[60] TCIP's argument that there is no evidence "showing when TCIP actually received the policy"—because Jensen has no record of receiving it—is unavailing.[61]

---

[55] R. Doc. No. 80-1, at 2.
[56] *Id.* at 2, 4.
[57] *Id.*
[58] *Id.* at 5–8. Crowe stated in her affidavit that she recognized the signature on this application as Louis's signature. *Id.* at 2.

Evidence also shows that Louis communicated with HUB regarding specific elements of TCIP's insurance policies: on May 5, 2017, HUB emailed Louis and Jensen asking for additional information needed for insurance renewal, including TCIP's equipment schedule. *See* R. Doc. No. 80-2, at 1. Louis responded to the inquiry four days later with "attached information." *See id.*
[59] *See* R. Doc. No. 80-1, at 12–22.
[60] *Id.* at 28.
[61] *See* R. Doc. No. 61, at 11.

Evidence further demonstrates that TCIP—and Jensen in particular—had notice of certain exclusions in the WLL policy as early as June 23, 2017. Specifically, HUB's June 23, 2017 email to Jensen and Louis alerted TCIP that the WLL policy contained an exclusion for fungus, spoilage, and infestation that may have been relevant to

Although HUB may have initially represented to TCIP that the WLL policy would cover losses from the wet product complaints, TCIP's reliance on that representation "was unreasonable in light of the fact that the policy in this case specifically contains [ ] straightforward, uncomplicated, exclusion[s] against damage caused by [processing, packaging, and outdoor storage]." *City Blueprint & Supply Co. v. Boggio*, 2008-1093, p. 10 (La. App. 4 Cir. 12/17/08), 3 So. 3d 62, 67.

As the insured, the duty was on TCIP to read and know its policy provisions. *Campbell*, 509 F.3d at 671. A simple review of the insurance policy would have put TCIP on notice that the policy did not provide the kind of coverage it needed for its operations at the 3900 France Road facility. *See id.* Any alleged misrepresentation from HUB that the policy included the desired coverage would have contradicted the policy's plain terms, putting TCIP on notice of the misrepresentation. *Id.*; s*ee Bens Bros., LLC v. Fid. Nat'l Prop. & Cas. Ins. Co.*, No. 06-5048, 2007 WL 3488205, at *4 (E.D. La. Nov. 13, 2007) (Barbier, J.) ("[S]everal judges of this Court have held that an insured's knowledge that the terms of a policy directly contradicts a representation

---

TCIP's coverage needs. *See* R. Doc. No. 61-12, at 1. Also in the June 23, 2017 email, HUB asked TCIP for its input "to make sure this exclusion will not cause a problem at any of the locations listed on the [WLL] policy," including the facility at 3900 France Road. R. Doc. No. 61-12, at 1. During Jensen's deposition, he acknowledged that he received Stalter's email "highlighting" these exclusions" on the WLL policy. R. Doc. No. 80-3, at 8.

As TCIP itself points out, "the exclusion for spoilage in the Warehouse Legal Liability policy is listed directly below the exclusion for packaging." R. Doc. No. 61, at 12. While TCIP may have "trusted that HUB would not have skipped over critical exclusions," R. Doc. No. 61-24, at 3, as the insured, the duty was on TCIP to read and know its insurance policy provisions. *Campbell*, 509 F.3d at 671.

or statement made by the insurance agent who sold the policy is sufficient to excite the attention of the victim and put her on guard. As such, an insured should have known of an insurance agent's neglect as of the date of issuance of the policy.") (citing *Dobson v. Allstate Ins. Co.*, No. 06-252, 2006 WL 2078423, at \*9 (E.D. La. July 21, 2006) and *Wirth v. Allstate Ins. Co.*, No. 07-1727, 2007 WL 2436695, at \*4 (E.D. La. Aug. 20, 2007)); *Jambon v. State Farm Fire & Cas. Co.*, 07-925, p. 4–5 (La. App. 5 Cir. 3/11/08), 982 So. 2d 131, 133 (finding that the plaintiffs had constructive notice that their flood insurance did not provide the coverage they desired when they received the policy because the policy document showed that such coverage was not included); *Burk Prop. Investments, LLC v. All. Ins. Agency Servs., Inc.*, 2008-0489, p. 6 (La. App. 4 Cir. 9/10/08), 993 So. 2d 810, 814 (concluding that the plaintiff had constructive notice that he did not have flood coverage when he signed his insurance policy documents).

TCIP's argument that it could not have known about the processing, packaging, and storage exclusions in its policy until "insurance companies began to express concerns" about the claims that TCIP filed for the wet product complaint is unavailing.[62] Uncontroverted evidence shows that Louis, the designated contact for TCIP's insurance policies, received the policy on August 3, 2017.[63] Because TCIP received the policy on that date, the peremptive period commenced on August 3, 2017. *See Campbell*, 509 F.3d at 671.

---

[62] R. Doc. No. 61, at 12; *see* R. Doc. No. 61-1, at 20; R. Doc. No. 61-19, at 1; R. Doc. No. 80-3, at 8.
[63] *See* R. Doc. No. 47-4, at 2.

TCIP acknowledges that the date of receipt of an insurance policy may serve as the date of "discovery" with respect to the running of the peremptive period.[64] Accordingly, it attempts to limit this concession to policies that are "straightforward and not complex."[65] Regardless, the policy that TCIP received on August 3, 2017 straightforwardly delineates the coverage exclusions for TCIP's packaging, processing, and outdoor storage of product.[66] Therefore, as previously stated, TCIP should have "discovered"—and had constructive notice of—the coverage limitations and exclusions for processing, packaging, and outdoor storage when Louis received the policy on August 3, 2017. *See* La. Stat. Ann. § 9:5606. Because TCIP did not file its action against HUB until January 7, 2019, its claims against HUB are perempted. *See Sw. Veterinary Servs., Inc. v. Hartford Cas. Ins. Co.*, No. 12-2281, 2013 WL 2471671, at *8 (W.D. La. June 6, 2013) (Minaldi, J.) ("If an insured has constructive notice that its insurance policy may not provide the coverage its insurance agent promised it would, an insured's resulting claim against its insurance agent and/or insurance company may be perempted if not brought within the time period provided in § 9:5606.")

## IV.

Based on the foregoing,

**IT IS ORDERED** that the motion is **GRANTED IN PART AND DENIED IN PART**. With the exception of TCIP's putative claim to recover the amount of

---

[64] R. Doc. No. 61, at 9.
[65] *Id.*
[66] *See* R. Doc. No. 47-20, at 44–57.

16

premium payments TCIP paid for the "Stock Throughput" policy, TCIP's claims against HUB are **DISMISSED WITH PREJUDICE**.[67]

New Orleans, Louisiana, February 13, 2020.

                                              **LANCE M. AFRICK**
                                   **UNITED STATES DISTRICT JUDGE**

---

[67] TCIP asserts that HUB's motion for summary judgment does not address the "premium payments that HUB caused TCIP to pay in 2018 for the stock-through-put policy." R. Doc. No. 61, at 23. HUB argues in response that TCIP has not pled such a claim, and that TCIP has not provided a legal basis that would entitle TCIP to recover these premiums. R. Doc. No. 80, at 10. Because the record does not sufficiently demonstrate the absence of a genuine dispute of material fact with respect to this putative claim, and this issue has not been sufficiently briefed by either party, the Court declines to dismiss this particular claim at this stage of the proceedings.